IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Elizabeth Gradek, | : | Case No. 1:16-cv-270 |
| Plaintiff, | : : | Judge Susan J. Dlott |
| v. | : : | **ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY** |
| Horseshoe Cincinnati Management, LLC, | : : | **JUDGMENT** |
| Defendant. | : | |

Plaintiff in this action, Elizabeth Gradek, has filed a lawsuit alleging illegal disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and complementary Ohio law, Ohio Rev. Code § 4112.02. Gradek alleges counts for failure to accommodate and for disability discrimination under each statute. Defendant Horseshoe Cincinnati Management, LLC ("Horseshoe") has filed a Motion for Summary Judgment on all claims. (Doc. 17).

Having been fully briefed, the Motion is ripe for the Court's decision. For the reasons set forth below, the Court will DENY Defendant's Motion.

I.  **BACKGROUND**[1]

A. **Horseshoe Table Games Department and Gradek's Position**

Horseshoe opened its Horseshoe Cincinnati Casino (the "Casino") on March 4, 2013. Gradek was hired as a Table Games Supervisor ("TGS") just prior to its opening on February 11, 2013. This position is part of the Table Games Department, which operates and staffs table

---

[1] Except as otherwise indicated, background facts are drawn from Plaintiff's Complaint (Doc. 1) to the extent admitted, Defendant's Proposed Undisputed Facts (Doc. 17-1), noting as well Plaintiff's response thereto (Doc. 20-1 at PageID 3223–29) and Proposed Disputed Issues of Material Fact. (*Id.* at PageID 3229–33).

1

games at the Casino, including blackjack, roulette, baccarat, craps, and various carnival games. The Table Games Department is comprised of a Director of Table Games, three Table Games Shift Managers, up to six Table Games Assistant Shift Managers, nearly one hundred TGSs, and hundreds of Table Game Dealers. Gradek was qualified to supervise every table game that the Casino offered.

The Casino, including this Department, is open twenty-four hours per day, seven days per week, and operates using three employee shifts. TGSs typically work an eight-hour shift, five days per week, with a thirty-minute break every two hours of work, though TGSs are sometimes required to work additional hours or days beyond their normal shift. During a given shift, a TGS is assigned a particular section and observes approximately four to six tables for suspicious activity. Craps is a particularly difficult game to supervise, because it is more complicated than other table games. There is a standing "floor person," responsible for supervising up to three craps tables per shift, and a "box" position, responsible for monitoring the two craps dealers on a particular table. Sitting "box" is the only defined TGS position that can be performed while seated.

A TGS may be assigned to a different table game each shift and is only made aware of their assigned table game upon reporting for her shift. In addition to the various table games, there is also a "relief string," which is a TGS position dedicated to covering the required thirty-minute breaks of other TGSs and that therefore may cover several different table games. Finally, some employees worked as a "Pencil," who is tasked with adjusting daily assignments based upon the Casino's needs.

### B. Gradek's Injury and Initial Accommodations

In May 2014, Gradek suffered a knee injury that left her on crutches. While the crutches lasted only a few weeks, on May 28, 2014, her physician temporarily restricted her from standing for more than one hour without a thirty-minute break.[2] Gradek then sought an accommodation and completed associated paperwork on May 30, 2014. Gradek's immediate supervisor was Assistant Shift Manager Chad Jenkins. He, with authorization from Director of Table Games Jay Bean, approved an approximately two-week accommodation beginning June 9, 2014 whereby Gradek would sit "box" or run "relief" on "boxes."

In late July 2014, the accommodation was still in place. Bean corresponded with Horseshoe Employee Relations Manager Chandra Deitmaring about the accommodation as updated. (*See supra* note 2.) Bean indicated to Deitmaring that a long-term accommodation was not possible, due to the difficulty in scheduling Gradek in positions allowing her to be seated the requisite amount of time for her condition and due to the fact that this would prohibit other TGSs from sharpening their craps skills.[3] Nevertheless, Gradek was granted another temporary accommodation through August 28, 2014. When, according to her physician, Gradek's restrictions did not change, the Employee Relations Department notified Gradek on August 28, 2014 that she was being placed on a leave of absence. She remained on this leave of absence until her termination. By December of 2014, Gradek could not stand more than ten minutes at a time.

---

[2] Plaintiff asserts that this was later reduced to fifteen minutes. (Doc. 20-1 at PageID 3226.) Defendant acknowledges that this took place on July 25, 2014. (Doc. 17-1 at PageID 96.)

[3] Plaintiff denies the accuracy of either reason provided. (Doc. 20-1 at PageID 3227.)

### C. Alternative Accommodations and Gradek's Termination

Horseshoe inquired with managers in other departments regarding prospective available positions. Gradek identified three positions for which she thought she may be qualified: Shuttle Bus Driver, Mousetrap Associate, and Casino Accounting Clerk. Horseshoe determined that Gradek was not qualified for the first two positions, but offered her the Accounting Clerk position. Gradek rejected the position,[4] and Horseshoe terminated her employment by letter dated May 21, 2015.

Horseshoe argues that it fired Gradek, because she could not stand for two and a half to three hours, ambulate, or rotate among table games, and that these are "essential functions" to the TGS position. Gradek disputes these are "essential functions" of the TGS positions.

## II. STANDARD OF LAW

Although a grant of summary judgment is not a substitute for trial, it is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The process of evaluating a motion for summary judgment and the respective burdens it imposes upon the movant and the non-movant are well-settled. First, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *see LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). This burden may be satisfied, however, by the movant "pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has

---

[4] Defendant argues that Gradek rejected the position due to lower pay. (Doc. 17-1 at PageID 99). Plaintiff argues that she was not qualified for the position, because she was not proficient in Excel. (Doc. 20-1 at PageID 3228–29.)

no evidence to support an essential element of his or her case." *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1389 (6th Cir. 1993).

Faced with such a motion, the opposing party must submit evidence in support of any material element of the claim or defense at issue in the motion on which it would bear the burden of proof at trial. *Celotex*, 477 U.S. at 331–32. As "the requirement [of the Rule] is that there be no *genuine* issue of *material* fact," the Supreme Court has made clear that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (emphasis in original). Ancillary factual disputes, those "that are irrelevant or unnecessary[,] will not be counted." *Id.* Furthermore, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252. Instead, the opposing party must present "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive summary judgment and proceed to trial on the merits. *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339–40 (6th Cir. 1993) (applying *Anderson*, 477 U.S. at 249–50; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

At this summary judgment stage, it is not the Court's role "to weigh the evidence and determine the truth of the matter but [rather] to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In so doing, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157–59 (1970) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962))). Adherence to this standard, however, does not permit the Court to assess

the credibility of witnesses. *See Adams v. Metiva*, 31 F.3d 375, 378 (6th Cir. 1994) (citing *Anderson*, 477 U.S. at 255)).

**III.  ANALYSIS**[5]

**A. Failure to Accommodate**

The following elements comprise a *prima facie* case for failure to accommodate under the ADA:

> (1) [the plaintiff] is disabled within the meaning of the ADA; (2) [the plaintiff] is otherwise qualified for the position, such that [the plaintiff] can perform the essential functions of the job with or without a reasonable accommodation; (3) the employer knew or had reason to know of his disability; (4) the employee requested an accommodation; and (5) the employer failed to provide a reasonable accommodation thereafter. *Johnson v. Cleveland City Sch. Dist.*, 443 Fed.Appx. 974, 982–83 (6th Cir. 2011)[.]

*Green v. BakeMark USA, LLC*, No. 16-3141, 2017 WL 1147168, at *3 (6th Cir. Mar. 27, 2017) (internal quotations and citations omitted). Horseshoe does not deny that Gradek is disabled, that it knew of her disability, and that Gradek requested an accommodation. At issue between the parties are only elements two and five.

**1. Was Gradek "Otherwise Qualified" for the Position?**

To demonstrate element two, Gradek must show (1) that she could perform the essential functions of the job without accommodation from the employer, (2) that the function she cannot perform is not an essential function, or (3) that she could have performed the essential functions of the job with a proposed reasonable accommodation. *EEOC v. M.G.H. Family Health Ctr.*,

---

[5] The Court reviews both the failure to accommodate and disability discrimination claims in the context of federal law, as the Ohio and federal disability discrimination statutes evoke substantially similar analyses, and the parties have not argued otherwise. *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 418 (6th Cir.2004), *cert. denied*, 543 U.S. 1146, 125 S.Ct. 1300, 161 L.Ed.2d 107 (2005) (collecting cases). *See also Barber v. Chestnut Land Co.*, 63 N.E.3d 609, 625 (Ohio Ct. App. 7 Dist. 2016) ("Ohio courts are permitted to use the federal regulations and cases in interpreting the federal statute.").

No. 1:15-cv-952, 2017 WL 410298, at *13 (W.D. Mich. Jan. 27, 2017) (internal citations omitted).

Gradek seeks to demonstrate the second of these: that standing, ambulating, and rotating among games are not essential functions of the TGS position. The following factors guide the Court's inquiry into whether such functions are essential:

> (1) the employer's judgment; (2) the written job description; (3) the amount of time spent performing the function; (4) the consequences of not requiring performance of the function; (5) the work experience of past incumbents of the position; and (6) the current work experience of incumbents in similar jobs.

*Keith v. Cty. of Oakland*, 703 F.3d 918, 925–26 (6th Cir. 2013) (citing 29 C.F.R. § 1630.2(n)(3)). "Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Id.* at 926 (internal citation omitted). "At the summary judgment stage, the employer's judgment will not be dispositive on whether a function is essential when evidence on the issue is mixed." *Rorrer v. City of Stow*, 743 F.3d 1025, 1039 (6th Cir. 2014) (internal quotation and citation omitted). Pertinent to the § 1630.2(n)(3) factors, the Court finds that Gradek has provided the following evidence.

### a. Written job description

The TGS written job description contains two headings: "Essential Job Functions" and "Additional Requirements." (Gradek Dep. Ex. 9 at PageID 1208–09, Doc. 17-5.) Under the first heading, there is no mention of a requirement to either stand for a long period of time or to rotate among tables. (*Id.* at PageID 1208.) Under the second heading, it lists: "[m]ust be able to sit, stand **or** walk[6] for long periods of time (4 hours)" and "[m]ust be able to maneuver throughout all areas of the property and from floor to floor either by stairways . . . or escalator." (*Id.*)

---

[6] Horseshoe mischaracterizes this phrase from the job description at two points in its Reply, suggesting that it requires standing *and* walking. (Def.'s Reply at PageID 3669, 3674, Doc. 23.) The actual text is disjunctive, as quoted here.

(emphasis added). Neither requirement conclusively establishes that standing for more than one hour at a time is an essential function of the TGS position. Gradek could certainly sit for four hours and could maneuver throughout the casino, though needing intermittent breaks to be seated.

### b. Amount of time spent performing the function

Gradek has also presented testimony that other duties performed by TGSs, not involving direct game supervision, do not require prolonged standing, ambulating, or rotating among games. (Gradek Dep. 132:12–133:9 at PageID 1008–09, Doc. 17-5 (describing the "Pencil" position); *id.* at 131:6–132:11, 133:10–134:8 at PageID 1007–08, 1009–10 (describing game training function); Jenkins Dep. 28:6–30:2 at PageID 652–54, Doc. 17-4 (describing two TGSs that worked almost exclusively in table game training as opposed to table game supervision).) Horseshoe even accommodated one TGS by allowing him to sit "box" for nine consecutive months.[7] (Gradek Dep. 18:2–6 at PageID 894, Doc.17-5; Jenkins Dep. 60:13–24 at PageID 684, Doc.17-4; Gradek Dec. ¶ 32 at PageID 3662, Doc. 21.)

### c. Consequences of not requiring performance of the function

Gradek has offered evidence to suggest that a TGS standing for long periods of time is not crucial to Horseshoe's Table Games Department operations. Chad Jenkins was a Table Games Assistant Shift Manager during Gradek's tenure. (Jenkins Dep.14:20–15:2 at PageID 638–39, Doc. 17-4.) Jenkins testified that Gradek's accommodation did not present the problem of her being "needed somewhere else and [not being able to] . . . . go[.]" (*Id.*, 79:14–19 at

---

[7] The Court acknowledges the case law cited by Defendant (Def.'s Reply at PageID 3672, Doc. 23), which discusses that the ADA does not require employers to convert temporary accommodations into permanent positions. *See, e.g., Wardia v. Justice and Pub. Safety Cabinet Dep't of Juvenile Justice*, 5089 F. App'x 527, 532 (6th Cir. 2013). For purposes of summary judgment, however, the Court finds the fact that these accommodations were made with virtually no documented objections by other employees to be probative of whether a trier of fact could conclude that standing, ambulating, or rotating were "essential functions."

PageID 703.) No other supervisors, managers, or "Pencils" communicated to him that Gradek's accommodation was interfering with other TGSs or was otherwise burdensome. (*Id.*, 80:7–20 at PageID 704.) This is contrasted with the *Brenneman v. MedCentral Health System* case, cited by Defendant, in which the proposed accommodation for a pharmacy technician would have required a great deal of missed work. 366 F.3d 412, 419 (6th Cir. 2004). Such absenteeism, having a negative effect on other employees and the employer as a whole, is not present here.

Moreover, certain testimony suggests that maintaining one TGS at a given table could improve game integrity. (*See, e.g.,* Jenkins Dep. 53:9–54:11 at PageID 677–78, Doc. 17-4; Boss Dep. 76:20–79:16; 155:6–156:13 at PageID 3310–13, 3389–90, Doc. 20-2; Gradek Decl. ¶¶ 20–23 at PageID 3660, Doc. 21). In her declaration, Gradek states that there was typically a minimum of three craps tables that were open during each of her shifts, which is corroborated by another TGS that normally worked Gradek's same shift. (Gradek Decl. ¶ 26 at PageID 3660, Doc. 21; Oberfoell Decl. ¶¶ 5, 12 at PageID 3652–53, Doc. 20-4.) Therefore, there is evidence that allowing Gradek to work craps exclusively would not prevent other TGSs from getting craps experience.

### d. Work experience of other Horseshoe TGSs or those in similar positions

Gradek also offers the testimony of Jenkins and the declaration of Thomas J. Oberfoell to demonstrate their work experiences with her position and similar positions with other employers. Jenkins has been in the casino industry for over twenty years; he was a TGS for a portion of that time and later moved into management. (Jenkins Dep. 5:10–15, 9:7–19 at PageID 629, 633, Doc. 17-4.) He was hired as a Table Games Assistant Shift Manager at Horseshoe in January of 2013, where he worked until January of 2017. (*Id.*, 14:20–15:2, 17:6–12 at PageID 638–39, 641.) Jenkins testified that there was a period of time when accommodations were offered

9

informally. (*Id.*, 60:3–12 at PageID 684.) In his opinion, keeping a supervisor on the same table for multiple days in a row was not important to game protection. (*Id.*, 49:14–20 at PageID 673.) Jenkins also testified he was never told, in his position as Assistant Shift Manager, that a long term extension of Gradek's accommodation would prevent other TGSs from developing craps skills or would prevent her from maintaining other game skills. (*Id.*, 78:6–18 at PageID 702.) Oberfoell has been a TGS at the Casino since November of 2012 and has been in the casino industry for twenty-three years. (Oberfoell Decl., ¶¶ 3–4 at PageID 3652, Doc. 20-4.) He spent eleven years as a TGS. (*Id.*) In his experience, he concluded that standing for more than one hour and rotating among tables is not an essential function. (*Id.*, ¶ 20 at PageID 3655.)

In addition to its discussion of the 29 C.F.R. § 1630.2(n)(3) factors, Horseshoe cites two cases in support of its argument that the ability to rotate among positions is essential. In the first, *Hendrixson v. BASF Construction Chemicals, LLC*, the plaintiff was able to work on only one machine that, due to working conditions, could be completely shut down leaving the plaintiff with no work to do. No: 1:07-cv-512, 2008 WL 3915156, at *7 (W.D. Mich. Aug. 20, 2008) (dismissing ADA claim on summary judgment). Further, that particular machine required the least skill, making it especially appropriate for a temporary employee. Neither circumstance is analogous to the case at bar, and the Court therefore finds the case unpersuasive.

In the second case, the plaintiff was a correctional officer, who requested avoiding positions that required inmate contact. *Dargis v. Sheahan, et al.*, 526 F.3d 981, 983 (7th Cir. 2008). This prevented him from "stand[ing] watch over the inmates, break[ing] up fights, inspect[ing] cells, escort[ing] inmates when they are out of their cells, or search[ing] for escaped inmates." *Id.* at 986. The *Dargis* court concluded that anything from an unusual prison riot to other, more routine, tense inmate situations, required inmate contact. *Id.* at 986–87. The Court

does not find the same level or urgency or necessity for safety and security here, and therefore also finds this case distinguishable.

By contrast, the Court finds *McMahon v. Regents of the University of Michigan*, No. 14-cv-11211, 2015 WL 6437155 (E.D. Mich. Oct. 22, 2015), cited by Plaintiff, more instructive. In that case, the court found the allocation of duties among employees according to their strengths to be probative of whether a duty was essential. *Id.* at *7; *see also Rorrer*, 743 F.3d at 1034, 1042 (fact that there was no written policy about firefighter's driving duties and fact that crews frequently divvied up the driving assignments on their own weighed against summary judgment). Jenkins testified that he scheduled TGSs to particular games based upon their strengths, and not necessarily to a fixed, rotational cycle. (Jenkins Dep. 9:23–10:16 at PageID 633–34, Doc. 17-4.)

In view of the foregoing, the question of whether standing or ambulating for more than one hour and rotating among games are essential functions of the TGS position presents a factual dispute.

**2. Did Horseshoe Fail to Provide a Reasonable Accommodation?**

Gradek requested to sit "box" or to run a "relief string" that included a box position as a reasonable accommodation, which Horseshoe denied.[8] In the paragraphs that follow, for purposes of the second disputed element of Gradek's failure to accommodate claim, the Court reviews the process surrounding the proposed accommodation and whether it was reasonable under the circumstances.

---

[8] The Court acknowledges Gradek's admission that she was unable to stand more than ten consecutive minutes as of December 2014—prior to her termination. Horseshoe points to this fact several times in its memoranda in support of its position that Gradek's proposed accommodation was unreasonable. Because the Court finds that Gradek has presented an issue of fact as to whether standing, ambulating, or rotating among games are essential functions of the TGS position, the Court does not find the aggravation of her injury to be dispositive here.

11

### a. Was the proposed accommodation reasonable?

To determine whether an accommodation is reasonable, courts are to consider the following factors:

> "(1) the particular job involved, its purpose, and its essential functions; (2) the employee's limitations and how those limitations can be overcome; (3) the effectiveness an accommodation would have in enabling the individual to perform the job; and (4) the preference of the employee." *Keever v. City of Middletown,* 145 F.3d 809, 812 (6th Cir.1998) (citing 29 C.F.R. app. § 1630.9(a)).

*Nighswander v. Henderson*, 172 F. Supp. 2d 951, 963 (N.D. Ohio 2001).

Factors one through three set out in *Nighswander* are part and parcel to the "otherwise qualified" discussion in Part III(A)(1), above. Whether standing more than one hour, ambulating, or rotating among table games is an essential function of the TGS position has been placed into question by evidence presented by Gradek. Gradek's limitations were overcome on a temporary basis—by sitting "box" and by running "relief strings." Horseshoe has pointed to no evidence, other than Bean's conclusory testimony, that the accommodation was ineffective or inconvenient to other TGSs or Assistant Shift Managers. (*See, e.g.,* Deitmaring Dep. 167:22–168:3 at Page ID 1551–52, Doc. 17-6 (testifying that she knew of no complaints).) Finally, it is evident that Gradek's preference was to maintain her TGS position with accommodations.

On the basis of the above, and particularly in light of the individualized inquiry required (*see infra* Part III(A)(2)(c)), the Court finds that Gradek has demonstrated a genuine issue of material fact as to whether her proposed accommodation was reasonable.

### b. Did the accommodation place an undue burden upon Horseshoe?

Only where reasonable accommodation would pose an undue hardship upon an employer should reassignment be considered; in that event, an employer must first attempt to reassign to an equivalent position. *Nighswander*, 172 F. Supp. 2d at 964.

Horseshoe primarily cites Bean's testimony for its argument that Gradek's proposed accommodation would have posed an undue hardship upon it. In particular, Horeshoe argues that "allowing Gradek to supervise only craps on a permanent basis . . . would prevent other TGSs on her shift from supervising craps and maintaining their skills for that game." (Def.'s Mot. Summ. J. at PageID 81, Doc. 17.) The Court is not persuaded. There is evidence in the record that multiple craps tables were open during Gradek's shifts. (Gradek Decl. ¶ 26 at PageID 3660, Doc. 21; Oberfoell Decl. ¶¶ 5, 12 at PageID 3652–53, Doc. 20-4.) At minimum, a genuine issue of material fact exists on whether the reasonable accommodation poses an undue burden upon Horseshoe. There is testimony to refute Horseshoe's assertion that rotation was necessary to game integrity. (*See* Jenkins Dep. 80:21–81:2 at PageID 704–05, Doc. 17-4 (testifying that he never heard that rotation was important to game protection); Gradek Dep. 107:16–108:12 at PageID 983–84, Doc. 17-5 (same); Oberfoell Decl. ¶ 14 at PageID 3654, Doc. 20-4 (in his experience, TGSs rotated "primarily to fill 'spots'" and not for security reasons).)

### c. Did Horseshoe engage in the interactive process in good faith?

Although the interactive process requirement is not spelled out in the ADA's text, it "is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862 (6th Cir. 2007). The inquiry is to be individualized, as summarized below:

> The ADA [] "mandates an individualized inquiry in determining whether an [employee's] disability . . . disqualifies him from a particular position." [*Keith v. County of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013)] (internal quotations and citation omitted). The individualized inquiry is an "interactive process" in which "both parties have a duty to participate in good faith." *Kleiber*, 485 F.3d at 871. The purpose is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (citing 29 C.F.R. § 1630.2(o)(3)). The ADA mandates this process to ensure that employers do not disqualify applicants and employees based on "stereotypes and generalizations about a disability, but based on the actual disability and the effect

that disability has on the particular individual's ability to perform the job." *Keith*, 703 F.3d at 923. "If this process fails to lead to reasonable accommodation of the disabled employee's limitations, responsibility will lie with the party that caused the breakdown." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).

*Rorrer v. City of Stow*, 743 F.3d 1025, 1040 (6th Cir. 2014).

Horseshoe has presented evidence that it engaged in the interactive process by providing a temporary accommodation, placing her on leave, and giving her the opportunity to look for different positions within the Casino. On the other hand, Gradek has presented evidence that the Horseshoe did not flesh out the reasonableness of her initially proposed accommodation. For example, Horseshoe Employee Relations Manager Deitmaring testified that her conversation with Bean regarding the accommodation did not go beyond simply asking him whether he was able to accommodate Gradek's request. (Deitmaring Dep. 155:22–156:2 at PageID 1539–40, Doc. 17-6). She further testified that she did not recall sitting down with Gradek to discuss her situation. (*Id.*, 156:3–12 at PageID 1540.) Until her deposition, Deitmaring appears to have been unaware of what running a "relief string," part of Gradek's proposed accommodation request, entailed. (*Id.*, 160:23–161:13 at PageID 1544–45.)

### d. Did Gradek reject a reasonable accommodation?

Where an employee is already being accommodated, reassignment is appropriate only in the event that the accommodation poses an undue hardship upon the employer. *Nighswander*, 172 F. Supp. 2d at 964. Given its conclusion that there is a material issue of fact as to whether the requested accommodation posed an undue burden upon Horseshoe, the Court finds it unnecessary to reach this issue for purposes of summary judgment. In any event, there is

conflicting testimony regarding whether Gradek was qualified for the Accounting Clerk position that Horseshoe ultimately offered her. (*See supra* note 4.)[9]

On the basis of the foregoing discussion, the Court concludes that Gradek has presented material fact issues as to whether Horseshoe failed to provide a reasonable accommodation.

**B. Disability Discrimination**

The following elements comprise the *prima facie* case for disability discrimination under the ADA:

> 1) [H]e or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011) (internal quotation and citation omitted).

The Court reads Horseshoe's Motion to contest only the second element: whether Gradek was otherwise qualified for the position. Horseshoe reiterates its position that "Gradek's inability to stand, ambulate, and rotate among games in any fashion" were essential functions of the TGS position that, if lacking, "would have severely hindered [Horseshoe's] ability to maintain a flexible workforce," and would have compromised game integrity. (Def.'s Mot. Summ. J. at PageID 85, Doc. 17.) For the reasons discussed in Part III(A)(1) *supra*, the Court finds that material facts preclude summary judgment on this claim, as well.

---

[9] In addition, the Court notes that Gradek states in her declaration that she was told by a manager in her interview that the position required "advanced experience in Excel . . . more than provided by Horseshoe's training class." (Gradek Dec. ¶ 35 at PageID 3662, Doc. 21.) Even while downplaying difficulties with Excel, Deitmaring expressly acknowledged in her testimony that Excel was the biggest challenge for those transitioning from table games to an accounting role. (Deitmaring Dep. 98:15–16 at PageID 1482, Doc. 17-6.) The Court has reviewed this section of Deitmaring's testimony and, viewed against Gradek's testimony, finds that there is a fact issue regarding her qualification for the Accounting Clerk position.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (Doc. 17) is **DENIED**.

**IT IS SO ORDERED**.

Dated: June 14, 2017
S/Susan J. Dlott_____
Judge Susan J. Dlott
United States District Court